Thank you very much, your honor. The issue in this case is whether for reimbursement for psychiatric hospitals a target amount that was initially derived from the base year should be employed for the cost years 2003 and 2004, or whether a capped amount that was put in place by the balanced budget act for a five-year period should instead be used. I'd like to concentrate on two major arguments this morning. The first one is a regulatory argument based upon CMS's regulations, and the second is allied to that and has to do with CMS's statements in the Federal Register leading up to this period. Can we start? I hate to make you do this, but the statute is most important to me. Yes. So either you want to start with the statute or give up on the statute. Do you have a choice? No, I'm not going to give up on the statute. Okay. So let's start with the statute. Okay. Starting with the statute, the statute basically, well, first of all, the target amount as defined by the statute originally refers to a base year, and the updated amount it says to apply the prior year's target amount for each new cost year. And that was always construed to mean based upon a base year until these caps came in. So the statute says, and now we're talking about 3A2 in the case of a later reporting period, the target amount for the preceding 12-month reporting period increased by the applicable percentage. Yes. And then H.I. says for a cost reporting period beginning during fiscal years 1988 through 2000, the target cost under 2 and 2 is a 75th percentile cap, right? Correct. And so for example, for the year 2002, the target amount is the cap amount under that. Yes. That's right, right? Mm-hmm. And that means that if you then go back to 3A2, that the target amount for the next year is preceding target. You begin with the preceding target amount, which is the cap amount. Even if it's not clear, it does seem to better reading of the statute, doesn't it? I don't think so, Your Honor. And here's the reason. It's the use of the word target amount that creates perhaps some lack of clarity here. You told me that the statute self-defines target amount, and that's what I was using. The target amount for such hospital is X. That's what it says. It says it's an update from the prior year's target amount. Mm-hmm. Okay. So what's the prior year's target amount? Right. And then doesn't HI tell you what the prior year's target amount is for fiscal year 2002? It says what the cap is. No. It says, in the case of a hospital unit that is within this class for a cost reporting period during fiscal year 2002, the target amount may not exceed the amount updated under Clause 2. That is, it may not exceed the amount in the 75th percentile. Yeah. It says it may not exceed, but the target amount could be different from the cap. Well, it could be. I'm not saying, that's why I'm saying, maybe it's not clear, but it does seem to the better reading that the target amount is what it says it is. The target amount is the amount, is an amount that can't exceed 75th percentile. Can't exceed. That's correct. But there's two other things that I would like to mention in that regard. First of all, CMS had, in effect during these years, I mean, they say that we should give deference to their interpretation. They had, in effect, a regulatory definition of what the target amount was. Of course, we're going to get to that. But on the language itself, we didn't look at whether we're giving them deference or not. The language itself, it seems, I'm not clear why the government doesn't have the better reading of the statute. Well, what I'll call the original target amount, perhaps, I mean, based upon the base year, continued to be computed during this time period, even for hospitals that exceeded the, for their original costs, exceeded the 75th percentile. And, in fact, sort of the natural reading of it, in my opinion, Your Honor, is that after 2002, you would, in fact, revert to that. And that's what CMS itself said on many occasions, and I've set them out in the brief, but we have about five long block quotes in there. All right. So then you really want to rely on what CMS has said, either in its regulations or otherwise. So why don't we go on to that? I interrupted you. No, that's okay. So go ahead. Sure. What I'm relying on here is several things in the regulations that were in effect at the time. And first of all is the definition of target amount, which I've mentioned, which is the allowable net Medicare inpatient operating costs in the hospital base year updated. That's A3? Yes, A3. And those are sort of terms of art. Anytime you encounter these words like net allowable costs or reasonable costs in Medicare, that means based upon the hospital's own costs as determined from its cost report, not it's totally inconsistent with a nationwide 75th percentile. That section only says it's derived from. It doesn't say it is. It says it's derived from, right? Yes. And then subsection B then says each hospital's target amount is based on its allowable net inpatient under the... and then continues on, right? Uh-huh. Is that... the fact that it's derived from doesn't necessarily mean it is. It doesn't say the target amount is this amount. It's derived from. And, of course, the one that's capped is also derived from the base year plus the increases plus the net capped, right? So is that inconsistent? Is there a view that that's what this means? I think there's two things there. The derived from, basically a target amount is a per discharge per patient amount. So you have to take all the costs in the base year and then determine what share is Medicare and then divide that among the number of Medicare discharges. So that's what the derived from means, I think. And as far as the 75th percentile, no, it cannot possibly represent anything regarding the hospital's own cost. They're taking a 75th percentile average across the United States and it's not related to the particular hospital's cost. Well, they're then limiting the hospital's cost by that, right? So if a hospital's cost were below that amount, this would have no effect, right? The cap would have no effect, right? Correct. Yes. So you get all the way up to the cap based on your cost, but you don't get the cap unless you have those costs. I'm right about that, right? Unless you meet or exceed those costs, yes. That's right. So in that sense, it's derived from the cost. It's not just derived from the cap, obviously, because if it was derived from the cap, everybody would get the cap, which they don't. Right. I mean, that much is true. But what I'm saying is that limiting Fayetteville City Hospital or anybody else who happens to exceed that cap to a national number means they're being reimbursed in a way that has no reference to their own inpatient operating costs. I mean, we were cut down here from, I can't remember the exact figure, but $16,000 or $17,000 per discharge to about $10,000 or $11,000 for both of these cost years. And it's because the hospital's costs were higher than a lot of other places, and the reason why they're higher is it's a geri psych facility, so-called. They have a whole group of patients there, and they tend to be sicker. You have to treat medical problems as well as psychiatric problems. Neither here nor there, but if the prospective payment system had applied, would they have been cut down also? I have no idea what effect that would have. Haven't you had some experience with that, though? PPS? Yeah. Well, there's all different kinds of PPS systems. There's the original IPPS, inpatient PPS, which went into effect- But then, doesn't the hospital that you represent, haven't they had some experience with PPS since it was- If they have, I don't know what their reimbursement rate is. I'm sorry. Let me ask you- It would not inherently be lower or higher. Not inherently, either way. Let me ask you a very- If we can pull back, at least for me, for a little bit here. Sure. It seems to me the way that deference works for our court is that somewhere along the line, either the statute or the regulations, you're going to have to show some clarity, right? Because if you can't point to clarity in resolving this problem to us, we're going to be deferring to the experts coming up with a reasonable interpretation. So you have to find some clarity somewhere. And as I take it, your argument is, and again, congressional intent is always a touchstone here, your argument is that it's clear that Congress didn't intend that the caps extend past 2002, right? I mean, that's part of your argument. It's clear that Congress did not intend those caps to- What part? Is that right? Am I- No, it's a little different from that. Okay. Okay? And if I understand this Court's precedents correctly and Chevron correctly and that sort of thing- See, we said- I had to bring it up. You said you were playing Chevron bingo out there. That Chevron deference applies in the sort of primary sense when you have a statute where Congress has delegated something to an agency and they give a formal interpretation of it by a regulation or some other official means. And our contention here is that that has been done in this case. CMS promulgated regulations to implement these caps. And basically, we're just asking that they be followed. But here's another view. So tell me what's wrong with this view. It's clear that Congress did not intend the caps to extend beyond 2002. But is there any evidence that Congress intended to go back to the base year TEFRA caps as well? I mean, isn't what's going on here is Congress did not anticipate this. Congress thought the PPF was going to be in place and it's not. And so what do we do in that sort of regulatory void? I would- And in that land, right, isn't that the land of great deference to CMS here? And in that case, I would ask you to follow what CMS said the results were going to be. And if you look at their publications in the Federal Register, they were quite clear. Okay, so then we get back to my point. You have to find clarity somewhere. And you're saying we should find clarity in what CMS said. Yes. Obviously, if we disagree with you on that, if we find some ambiguity in the regulations here, then you lose. But that's the point. Well- So you're resting your argument, I take it, on the clarity of the regulation. Clarity of the regulatory scheme and CMS's interpretation of it. Okay? Contemporaneous interpretation of it, not retroactive. The unusual thing we've got here is that usually when you have an APA case, you've got a decision, you've got a rule, you've got an agency issuance of some type, you know, and the question is look at that and see if it comports with APA requirements. Here what we've got is an amendment that came up in 2005 that purported to change the effectiveness of the statute. I mean, this is what they're- That's not what they purported to do, they- Of the regulation, I'm sorry. Well, I guess there are two different problems, I suppose. One is the regulation, but they say all they were doing is clarifying the decision that they've always intended, that they've always taken. It's described as clarification, right? They described it, but let me just point you back- You said it was intended to change. They say it was intended to clarify. Well, in point of fact, in the reimbursement context, it caused a great change. It caused my client to, you know, lose a heck of a lot of money. Does it change the fact that it did not purport to be changing the effectiveness? It did not purport to, but in my view, it did. In the real world, it did. And what they said, for over a period of years, every year, you know, they publish a IPPS regulation, and over a period of years, they said that on or after October 1, 2002, payments to these classes- Tell us what you're looking at. Oh, I'm sorry. This was the proposed reg in the spring of 2002, and then there's another one that follows it, the final IPPS reg for 2003. In other words, the very cost year we're dealing with here, the very first year, and they say that these excluded hospitals or hospital units are no longer subject to caps on the target amount. But then they go on to say, these excluded hospitals and hospital units continue to be paid on a reasonable cost basis. You're looking at the 2002, August 1, 2002? Sorry, no, this one is May. What about the August? The August, just to complete the May, it says paid on a reasonable cost basis, and payments are based on their Medicare inpatient operating costs, not to exceed the ceiling. That's a hospital-specific cost. That's how CMS interpreted its own regulation. And then for the August one- Can I just ask about this? This is a back question. There's no cap applied in 2003. There's this echo effect that you talk about of the cap, but there is no actual cap applied in 2003, right? I don't call it an echo effect. I think one of the other courts did. But my point is that it has the exact same effect as a cap. Well, it can still go above whatever the cap would be. There's no cap in 2003. It just uses the preceding- Yeah, so then it's just updated by a couple of percentage points. Well, it depends on, I think, the year, and I don't know, I assume it has something to do with the cost of living or something like that, right? It does. So when they say that beginning in 2003, payments will no longer be subject to a 75th percentile cap, again, it seems at least one reading- Well, CMS is- It seems like a straightforward reading, is that in 2003, there's no cap. That doesn't say anything about how you calculate 2003 based on whether there was a cap for the- It does, though. In May, it says- Sorry. In May, it says that they will be paid on the basis of their reasonable costs, and payments are based on their Medicare inpatient operating costs. That has to- Well, that's true under all of the systems, but to a point. And that's a true statement. Even if you have a campus line, it's still a true statement. It's based on the actual cost, and you may not get back all of it, but it's still a true statement. It's based on- I don't think so, Your Honor, because under PPS, for instance, it's not really based on cost. It's based upon a prospectively- Well, under all the possibilities here, you started with costs. Now, you get to a cap under some of the possibilities. Yeah, but the cap is not- But it's still based on the cost. Yeah. But, you know, it says, they'll be paid based upon their aggregate Medicare inpatient operating costs, which may not- It also says that it would still be computed using the hospitals for the unit's target amount from the previous cost report. Is that right? For 2003? For 2003, what they're doing in the regulation that we rely on, which is CMS's regulation, 413 .40 C4 and this is the- I'll call it triple I. That's the governing regulation at this point. That is not- So this is important, I think. You're saying that it should be based on triple I. Yes. But the provision that you're- the rule that you're actually talking- the May statement that you're talking about under A1, the last sentence of A1 says- That whole paragraph is all about in accordance with the existing double I. Right? It doesn't say triple I. It says in accordance with the existing double I. Yeah, but double I is subject to triple I. Well, the government's position is triple I doesn't apply, so you would have a strong case and they say that again on the next page, if it said you were to be using triple I, which is what you said in your argument, but the May statement doesn't refer to triple I. It does refer to double I, that's correct, but it's subject to triple I, and if you look at the regulation, look at the structure of it, basically triple I, which was added at the time that the caps went into effect, is made the only small subsection there that applies to psychiatric hospitals, long-term care hospitals, and rehab hospitals. It says if you want to know the rule for those kinds of hospitals, you look at triple I. That's all you look at. And if they wanted to go back to double I, then you get into a situation where it says it's based upon updating the previous year, but then we come to the circular question as to target amount. And what was the previous year's target amount? Was it capped or not? That's good to give this question, which is you have to give us clarity, not circularity. Right. Well, I'm saying the clarity is here in the statements that CMS made, which basically said we're going back to the old system. You're going to get your inpatient operating cost now, after 2002. Caps are expired, they're all gone, and there's not the slightest hint in there anywhere that it's going to be a capped amount. They could have said that if that was going to be the case, and they did. Isn't that a bit surprising given the trajectory of congressional action on this one? I mean, everything was leading towards capping or having things go down. And to come along and say, and you're saying CMS, I understand it, but my question is isn't that surprising that CMS took that view at that time given what seems to be the direction Congress was pushing this in? I see no evidence that Congress wanted to go back to the good old days that you're trying to claim for those two years now. I think it's a strong argument. I think the one that you raised in the statements by CMS will hear from the government what they have to say about that. All right. Thank you very much. Thank you. That was called a set-up. Good morning. May it please the Court, Karen Schoen on behalf of the Secretary. In calculating the hospital's target amount, CMS did exactly what the statute unambiguously required it to do. Section B3a Little Roman II of the statute, which sets forth the meaning of target amount, provided that a hospital's target amount for a given cost period was equal to its target amount for the preceding 12-month cost reporting period, updated by the applicable percentage increase. To calculate the hospital's 2003 target amount, the agency had to use the 2002 target amount, notwithstanding that it had been limited by the cap. Even if there were some ambiguity in the statute, the agency's decision to use the 2002 target amount, which had been limited by the cap, was reasonable. And as Judge Griffith just pointed out, I think the legislation over time evidences a clear congressional intent to limit the growth of Medicare costs and to move toward a more uniform objective reimbursement standard and to revert to a base-year calculation as if the caps had never applied simply flies in the face of that congressional intent. And I think it's helpful to actually look at the numbers in this case. The hospital's 2002 target amount, which was limited by the cap, was $10,469. The applicable percentage increase for 2003 was 3.5%, and so the 2003 target amount that the agency calculated was $10,835. Under the calculation that plaintiff advocates, its 2003 target amount would be $18,298. That's almost a 75% increase over the 2002 target amount. And given the clear congressional intent to limit the growth of Medicare costs, I think that simply cannot be what Congress intended. Has the prospective payment system come into play now? Yes. Do we know what it would have been under that? I don't know the figures. I think the purpose of the prospective payment system was also to limit growth and to not let it rely only on individual hospitals' costs. That's right, to reduce a lot of the variability and to have more uniform payment standards. That's correct. You know, you spent a lot of time looking at the preamble in August 1, 2002 and hospital's counsel pointed to the use, for example, of I was actually talking about the May 1, although I asked about the August 1. Okay. Well, if it's okay, I'll point to the August 1 language. I have that in front of me. It's at 67 Fed Reg 5103. And he pointed to the reasonable cost language there. And one thing I'd like to just point out, the context of this, because this discussion was in the context of Congress' directive to move to the prospective payment system. And the very next paragraph beyond what was quoted in the briefs then talks about beginning after October 1, 2002, rehabilitation hospitals and long-term care hospitals would be moving to a prospective payment system. And I think then the reference that the agency used for reasonable cost was meant to distinguish the two types of systems. The old reasonable cost system that was governed by Part 4.13 of the regulations, of which the regulation that's at issue here was a part, versus the new prospective payment system where the implementing regulations were in Part 4.12. And so I just want to make sure that it's clear that it wasn't meant to refer to a hospital's own reasonable cost, and therefore it couldn't potentially have been limited by the cap. I think it was really just meant to distinguish the two types of systems. I'd also like to note, and I apologize, this provision is not in our addendum, but there's also another provision that was enacted at the same time as the caps in Section B.7 of the statute, which applied to so-called new providers. And those were hospitals that first received reimbursement after October 1, 1997. And what that did is it limited, it effectively imposed a cap of 110% of the median target amounts for a given year. And there was no expiration. So I think it would be somewhat anomalous to go back to a base-year calculation as if there had never been any caps for old providers, but to effectively cap new providers to 110. Did you make that argument in your brief? We did not, Your Honor, no. I wonder why not. I don't have a good answer for that. We usually pay more attention to arguments related to briefs. And it seems a rather good one. I agree. I wish we had mentioned it in our brief. I'm happy to answer any other questions the Court may have. If there are no further questions, we'd ask that you affirm the judgment of the District Court. Thank you. Thank you. Thank you, Your Honor. One thing that really hasn't been mentioned too much as part of all this is the fact that this whole change, and it was a change because it changed our reimbursement and a lot of other providers as well, was all implemented completely retroactively. It was done in August of 2005. That's when the final Federal Register notice was passed. It's only retroactive if you think that it was a change. I appreciate that yours changed because the intermediary originally did one thing and then did another. But the question is whether HHS has changed its view. It changed its view, and I think it has changed its view, as I've argued before. My point is that, just from a timing perspective here, this is after the health care services were provided by the hospital, after the cost is in question, after the notice. If we thought that there wasn't a change, that this is consistent with the view that they expressed in 2002, then there's no retroactivity question. That's a hard one to answer because their expressions were so clear. I'm asking for a hypothetical. Imagine that we thought that in 2002 they were clear about this, and what they said in 2005 was only as they claim a clarification. Then there's no retroactivity. I guess if there's no change, there's no retroactive change. Thank you very much. Thank you. Thank you on both sides again. Good arguments. We'll take this matter under submission and the Court's ready to receive it.
judges: Garland, Griffith, Sentelle